Sheryl D. CLINE, Plaintiff,

v.

ADVANCED NEUROMODULATION SYSTEMS, INC., d/b/a St. Jude Medical Neuromodulation Division, Defendant.

Civil Action No. 1:11–CV–4064–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 31, 2014.

Clark H. McGehee, William Cyrus Lanham, Lanham & McGehee, P.C., Johnson & Ward, Atlanta, GA, for Plaintiff.

Moses Kim, Kevin Alan Spainhour, Insley & Race, The Mayfair Royal, Atlanta, GA, for Defendant.

## ORDER

AMY TOTENBERG, District Judge.

Before the Court is Defendant's Motion to Dismiss [Doc. 65]. This case arises from the surgical implantation of a medical device and the injuries sustained from its failure and removal.[1] For the reasons described below, Defendant's Motion to Dismiss [Doc. 65] is **GRANTED IN PART** and **DENIED IN PART**.[2]

From the outset of its case, Plaintiff has endeavored to allege a tort claim based on the failure of her Eon Mini Model 3788 Spinal Cord Stimulator ("Model 3788"), a type of implantable pulse generator ("IPG"). However, such state law claims are generally preempted by virtue of the FDA's regulatory authority over medical devices. *See* 21 U.S.C. § 360k; *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 321–22, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). An exception exists for state claims premised on an injury that is causally linked to the violation of FDA regulations. *Riegel,* 552 U.S. at 330, 128 S.Ct. 999. Such "parallel claims" escape preemption because they do not impose additional duties beyond requirements under federal law.[3] *Id.*

On November 7, 2012, 921 F.Supp.2d 1374 (N.D.Ga.2012), the Court evaluated whether Plaintiffs proposed Second Amended Complaint stated a parallel claim. (Doc. 42.) The Court held that Plaintiffs amended parallel claim for "Violation of FDA Regulations and Current

---

1. The factual background of this case is available in prior Orders of the Court. (*See* Docs. 25, 42.)

2. Defendant also filed a Motion to Exclude Evidentiary Material [Doc. 71] objecting to Plaintiff's attachment of a four-page document to its response in opposition titled "Pre–Market Approvals and Supplemental Pre–Market Approvals of the Genesis System." Defendant argues this attachment exceeded the given page limits and contains impermis-

sible additional argument. The Court reviewed this attachment and determined it comprises a useful summary of the Model 3788 premarket approval history, and consults it for that reason only. Accordingly, Defendant's Motion to Exclude Evidentiary Material [Doc. 71] is **DENIED.**

3. The policy underlying parallel claims is described in greater detail within the Court's June 15, 2012 Order. (Doc. 25.)

Good Manufacturing Practice Requirements" should not be denied as futile. At the same time, the Court directed Plaintiff to file a Third Amended Complaint that more precisely identified "the particular [premarket approval] specifications she contends were violated and linked to the injuries she suffered." (*Id.* at 1382.) To this end, the Court authorized a period of limited discovery into the FDA's premarket approval ("PMA") specifications for the Model 3788 IPG. (*Id.* at 1382–83.)

Plaintiff filed her Third Amended Complaint ("TAC") on March 21, 2013, alleging the following claims: (1) breach of express warranty; (2) negligent manufacture and failure to warn; (3) strict liability; (4) breach of implied warranty; (5) material misrepresentation; and (6) violation of Georgia's Uniform Deceptive Trade Practices Act ("UDTPA").[4] (TAC, Doc. 62–1.) Defendant moved to dismiss the TAC pursuant to Fed.R.Civ.P. 12(b)(6).

## I. Legal Standard

This Court may dismiss a pleading for "failure to state a claim upon which relief can be granted." Rule 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1216 (3d ed.2002); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Duke v. Cleland,* 5 F.3d 1399, 1402 (11th Cir.1993). The pleader

need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

## II. Discussion

In response to Defendant's Motion to Dismiss, Plaintiff withdrew her claims for breach of implied warranty and violation of the UDTPA. (Pls. Resp. Opp., Doc. 66 at 29, 34.) The Court begins by reviewing the standard for pleading parallel claims and the Model 3788 premarket approval before addressing Plaintiff's remaining claims for breach of express warranty, negligent manufacture and failure to warn, strict liability, and material misrepresentation.

## A. Preemption and Parallel Claims [5]

The FDA is tasked with the regulation of medical devices. *See* Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360c *et seq.* Surgically implantable devices, such as the Model 3788, pose inherent risks and are subject to close regulatory scrutiny. The FDA generally requires that the manufacturers of such devices obtain premarket approval ("PMA") before the devices are made commercially avail-

---

4. The TAC also provides notice of a potential claim under Georgia's Fair Business Practice Act ("FBPA"); Plaintiff asserts she may seek to add such a claim in tie future. (Doc. 62 ¶¶ 157–168; Pls. Resp. Opp., Doc. 66 at 34.)

5. A fuller discussion of preemption can be found in the Court's June 15, 2012 Order. (Doc. 25.)

able. 21 U.S.C. § 360c(a)(1)(C). The FDA reviews PMA applications for a "reasonable assurance of safety and effectiveness." 21 U.S.C. § 360e(d). This review encompasses (1) data supporting the safety and effectiveness of the device; (2) detailed descriptions of the device's design, components, and method of manufacture; and (3) a sample of the proposed labeling of the device. *Riegel*, 552 U.S. at 318, 128 S.Ct. 999.

Once a device receives premarket approval, manufacturers cannot alter the "design, manufacture, label, or other attribute that affects the 'safety or effectiveness' of the device without an additional or supplemental PMA." *Horn v. Boston Scientific Neuromodulation Corp.*, No. CV–409–074, 2011 WL 3893812 at *3 (S.D.Ga. Aug. 26, 2011) (quoting § 360e(d)(6)(A)(i)). The FDA has promulgated guidelines covering the design, production, inspection, testing, labeling, packaging, handling, storage, distribution, and installation of medical devices that require premarket approval. *See* 21 C.F.R. §§ 820.1–820.250.

The Supreme Court has established a two-pronged test for claim preemption under the MDA. *Riegel*, 552 U.S. at 321–322, 128 S.Ct. 999. First, courts must determine if the federal government has established requirements relating to the device. *Id.* If so, courts then evaluate whether a state claim imposes requirements relating to the safety and effectiveness of the device that are "different from, or in addition to" federal requirements. *Id.*

In *Riegel*, the Court held that the premarket approval process imposes federal requirements under the MDA and satisfies the first prong of this test. *Id.* at 322, 128 S.Ct. 999. Thus, preemption is generally a question of whether state law claims relate to the safety and effectiveness of the medical device. The Court concluded that claims of strict liability, breach of implied

warranty, and negligence based on the rupture of a cardiac catheter posed state law "requirements" that relate to the safety or effectiveness of a device, and were thus preempted. *Id.* at 323–327, 128 S.Ct. 999.

Parallel claims avoid preemption because they are not "different from, or in addition to the requirements imposed by federal law." *Id.* at 330, 128 S.Ct. 999 (quotation omitted). To adequately plead a parallel claim, a plaintiff must (1) claim the violation of a particular federal regulation and (2) "set forth facts pointing to specific PMA requirements that have been violated." *Wolicki–Gables v. Arrow Intern., Inc.*, 634 F.3d 1296, 1301 (11th Cir. 2011). Furthermore, a plaintiff must allege a cognizable link between the violation and the injury alleged. *Id.* at 1301–1302; *Leonard v. Medtronic, Inc.*, No. 1:10–CV–03787–JEC, 2011 WL 3652311, at *6 (N.D.Ga. Aug. 19, 2011) (noting that the causal connection between the alleged violations of FDA regulations and the injuries or harm suffered is " 'a critical element' of a properly pled parallel claim" (quoting *Franklin v. Medtronic, Inc.*, No. 09–CV–02301–REB–KMT, 2010 WL 2543579, at *10 (D.Colo. May 12, 2010))).

### B. The Model 3788 PIMA

The Model 3788 is part of the Genesis System line of IPGs. (Doc. 62 ¶ 20.) The FDA approved Defendant's initial PMA No. P010032 for the original Genesis model on or around November 21, 2001. (*Id.* ¶ 14.) Subsequent models, including the Model 3788, were approved as supplements to PMA No. P010032. (*Id.* ¶ 15–16.) The FDA's PMA supplemental review process is a streamlined one that relies on a manufacturer's compliance with Current Good Manufacturing Practice ("CGMP") requirements. (*Id.* ¶ 19.) Supplemental approval can be used for relatively quick

approval of "[c]hanges in the performance or design specifications, circuits, components, ingredients, principle of operation, or physical layout of" an already-approved device. 21 C.F.R. § 814.39. Manufacturers seeking PMA supplemental review may incorporate information from the parent PMA. See 21 C.F.R. § 814.39(c) ("All procedures and actions that apply to [a premarket approval application] also apply to PMA supplements except that the information required in a supplement is limited to that needed to support the change.").

Defendant sought supplemental approval for the Model 3788 and claimed it represented a modification of an approved model, sporting a smaller size and a modified battery. (Doc. 62 ¶ 20.) In its PMA supplement application, Defendant claimed the Model 3788 would perform substantially equivalent to the Genesis model and the Model 3716 (itself a supplement approved device from the Genesis PMA), both of which had been approved by the FDA. (*Id.*) As a result, Defendant was able to "bridge" information found within these PMA submissions, and incorporated information relating to safety and efficacy of the Genesis and Model 3718 into the PMA supplement application for the Model 3718. (*Id.*) Defendant was required to submit data regarding the battery life of the Model 3788 due to its new battery and was not required to conduct real-world testing of the Model 3788. (*Id.* ¶¶ 20, 24.) Instead, this testing was done using a mathematical model projection, and Defendant represented to the FDA that these test results showed that the Model 3788 "[would] provide longevity for the patient in excess of 10 years when cycled" according to the test parameters. (*Id.* ¶¶ 24–25.) Defendant received PMA Supplement No. S023 for the Model 3788 on March 28, 2008. (*Id.* ¶ 20.)

## C. Breach of Express Warranty

██ Defendant first argues that Plaintiff's claim for breach of express warranty should be dismissed because the parties were not in privity. (Doc. 65–1 at 42.) This argument is without merit. "[U]nder Georgia law, privity of contract between the manufacturer and ultimate consumer is established when the manufacturer extends an express warranty to the ultimate consumer." *Lee v. Mylan Inc.,* 806 F.Supp.2d 1320, 1326 (M.D.Ga.2011) (finding privity where a drug manufacturer made "affirmations of fact or promises" to an ultimate consumer); *see also Jones v. Cranman's Sporting Goods,* 142 Ga.App. 838, 237 S.E.2d 402 (1977). The TAC alleges that Defendant's Limited Warranty made such affirmations of fact or promises to Plaintiff, thus privity is deemed to exist. (Doc. 62 ¶ 92.)

Defendant next argues that it never breached the Limited Warranty because it timely replaced the subject Model 3788 for free. (Doc. 65–1 at 45.) *See Ford Motor Co. v. Gunn,* 123 Ga.App. 550, 181 S.E.2d 694, 696 (1971) (finding that a particular car warranty provided an opportunity to cure defects, and "it is the refusal to remedy within a reasonable time, or a lack of success in the attempts to remedy which would constitute a breach of warranty"). Essentially, Defendant argues that this claim fails because Plaintiff has not alleged any recoverable damages under the Limited Warranty.

██ Unlike in *Ford,* the failure of Plaintiff's Model 3788 required its surgical extraction. (Doc. 62–1 ¶ 175.) Defendant's $20,740 reimbursement to Henry Medical Center does not appear to contemplate the cost of this additional surgery. Furthermore, Defendant does not explain why Plaintiff is barred from such consequential

damages under O.G.C.A. § 11–2–715(2).[6] As Plaintiff seeks recovery for surgical costs that were proximately caused by the Model 3788 failure, Plaintiff has adequately pled damages arising out of Defendant's alleged breach of express warranty based on the Limited Warranty. (Doc. 62–1 ¶ 175.) Defendant's Motion to Dismiss this claim is therefore **DENIED.**

Defendant also seeks dismissal of Plaintiffs breach of express warranty claim to the extent that it relies on oral representations by Defendant's agent. (Doc. 65–1 at 43–44.) The Court did not reach this argument in its June 25, 2012 Order because it found Plaintiffs claim based on the Limited Warranty was sufficient to survive a motion to dismiss. (Doc. 25 at 9 n. 4.) The Court declines to revisit this ruling now.

### D. Negligence and Strict Liability Claims

Plaintiff's negligence and strict liability claims relating to the manufacture of her device are based on allegations that her Model 3788 completely ceased to function about six months after it was installed, and that this failure was caused by a cracked weld on the battery. (Doc. 62 ¶¶ 5–9.) Arguing against dismissal, Plaintiff groups together her negligence and strict liability claims related to the manufacture of the Model 3788. (Pls. Resp. Opp., Doc. 66 at 10.) Plaintiff seeks to show that both claims are parallel claims that seek relief for the violation of federal regulations specific to the Model 3788.

As an initial matter, Plaintiffs strict liability claim cannot survive preemption because Georgia's strict liability provision does not require the violation of any standard of care, let alone a standard that parallels federal regulations.[7] *See* O.C.G.A. § 51–1–11(b)(1). Therefore Plaintiff's claim under strict liability cannot be genuinely equivalent to Defendant's requirements under federal law, and is thus preempted. *See Wolicki–Gables,* 634 F.3d at 1300.

The court now turns to Plaintiffs alleged parallel claim for negligent manufacture. Plaintiff first argues that the PMA Supplement No. S023 required that the Model 3788 have a ten-year battery life performance standard. (*Id.* at 10–11.) She then asserts that Defendant failed to conduct federally adequate testing of the Model 3788. Finally, Plaintiff argues that attached exhibits to the TAC demonstrate that the FDA had determined the Model 3788 was in violation of PMA requirements. The Court considers each argument in turn.

#### 1. Ten-year battery life

Plaintiff's negligence claim fails to the extent that it relies on an alleged violation of a federal requirement that the IPG battery last at least ten years, because no such federal requirement existed. According to Plaintiff, the Model 3788's S023 supplemental approval necessarily mandated that the IPG have "a minimal longevity [of] 10 years at nominal settings," among similar requirements. (Doc. 62 ¶ 78.)

6. The parties' briefings do not thoroughly address the remedies available under this breach of express warranty claim; thus, the Court does not define the scope of remedies at this time.

7. "The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." O.C.G.A. § 51–1–11(b)(1).

Plaintiff explains that Defendant's supplemental PMA application for the Model 3788 asserted that the battery "could" last ten years. (Doc. 62 ¶ 23.) Relying on this representation, the FDA approved PMA Supplement S023. (*Id.* ¶¶ 23–24.) So according to Plaintiff, the "device was specifically approved for marketing and sale only on the basis that the minimum rechargeable battery longevity shall be 10 years and that the life of the IPG shall also be 10 years." (*Id.* ¶ 24.) Plaintiff essentially argues that because a battery life in excess of ten years was "required" to obtain PMA approval, this measure of battery life is a performance standard. (*Id.* ¶ 78.) Plaintiff, however, is mistaken.

The FDA's promulgation of performance standards for medical devices is governed by 21 U.S.C. § 360d. Under this section, "the FDA may require that a device meet certain performance standards if it determines that a performance standard is necessary to provide reasonable assurance of the safety and effectiveness of the device." *Walker v. Medtronic, Inc.,* 670 F.3d 569, 573 (4th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 162, 184 L.Ed.2d 234 (2012) (quotation omitted). The FDA does not establish a performance standard by implication. On the contrary, performance standards come into existence through typical rulemaking procedures including publication in the Federal Register followed by a comment period. 21 U.S.C. § 360d(b).

Essentially, Plaintiff argues that the FDA established a ten-year battery life performance standard purely by implication. Instead, Plaintiff's claims more accurately allege that the FDA relied on Defendant's representations and supporting data that the Model 3788 was expected to function for ten years when it approved PMA Supplement S023. But Plaintiff fails to allege that the FDA followed the rule-making procedures set forth in the statute to promulgate an actual performance standard mandating a ten-year battery life.

Even assuming that the FDA could establish a performance standard outside the rulemaking process, material attached to the TAG suggests that this did not occur for IPG battery life. The FDA Summary of Safety and Effectiveness Data for PMA P010032, upon which the Model 3788 S023 in part relies, found that the original Genesis model had a battery failure rate in patients of about 1.9%. (TAG Ex. 2, Doc. 62–3 at 14, 21.) Nevertheless, the FDA concluded that the available clinical data "provides reasonable assurance that the Genesis [IPG] is safe and effective when used to treat chronic intractable pain . . . ." (*Id.* at 21–22.) Thus, the FDA determined that this rate of battery failure was an acceptable risk when weighed against the overall benefit conferred by the device. Given the FDA's tolerance of some battery failure in implantable IPGs, it makes little sense to conclude that, without more, the failure of a battery to last ten years gives rise to a parallel claim.

In sum, Plaintiff cannot state a parallel claim by asserting the Model 3788 failed to exhibit an alleged federally-required ten-year battery life.

### 2. Design validation

Plaintiff next argues that Defendant failed to carry out design validation testing "under actual or simulated use conditions" pursuant to 21 C.F.R. § 820.30(g). (Doc. 66 at 13.) Essentially, Plaintiff alleges that Defendant's reliance on a mathematical model projection based on the performance of older models (specifically the Eon IPG Model 3608) was insufficient under § 820.30(g). (Doc. 62 ¶¶ 24–25.) Plaintiff believes the Model 3788's miniaturized battery design warranted real-world battery testing. Defendant contends that

§ 820.30(g) represents a generic CGMP that is not a device-specific PMA requirement and cannot serve as the foundation of a parallel claim. (Doc. 65–1 at 7–8.)

 The Court agrees with Defendant. While § 820.30(g) does require manufacturers to conduct testing, this regulation offers little guidance as to what qualifies as "simulated use conditions" for the Model 3788. Plaintiffs allegations fail to explain why Defendant's use of mathematical modeling represents a violation of § 820.30(g). It would seem that any examination of the longevity of the Model 3788 battery would have to rely at least in part on mathematical extrapolation; the unappealing alternative would be to conduct a ten-year battery test. Based on Plaintiffs allegations, Defendant submitted data from mathematical projections to the FDA, which ultimately approved the S023 for the Model 3788. (Doc. 62 ¶¶ 24–25.) Additionally, the TAG avers that Eagle-Picher, the manufacturer of the Model 3788 battery, conducted testing on these batteries and provided the results to the FDA. (*Id.* ¶ 26.) Plaintiff's allegations fail to plausibly allege that Defendant's use of mathematical projections in its testing of the Model 3788 battery was in violation of § 820.30(g). Alternatively, to the extent this argument seeks to challenge the FDA's reliance on this data in its approval of PMA Supplement No. S023, it is preempted.

### 3. FDA inspections, device corrections, and voluntary recalls

Plaintiff next introduces evidence of FDA inspections and device recalls to show that Defendant violated one or more Model 3788 PMA requirements. Plaintiff cites an FDA Form–483 documenting an inspection of Defendant's Piano, Texas facility as evidence of plausible CGMP violations. (*Id.* ¶¶ 74–75; TAG Ex. 17, Doc. 62–18 at 2.) The Form–483 is used by the FDA to document observations made during inspections of approved PMA device manufacturers. (Doc. 62 ¶ 72.) The Form–483 is limited to observations only, and "[does] not represent a final Agency determination regarding [a manufacturer's] compliance." (Doc. 62–18 at 2.) Plaintiff lists a number of critical observations, but fails to allege how they are linked to her claims. For instance, one of the more specific FDA observations challenged the testing protocol used to ensure the Eon Mini met safety requirements for heat generation. (*Id.*) The inspector asserted that there was no explanation why the testing protocol simulated conditions inside the human body. (*Id.*) Yet, Plaintiff alleges that her own Model 3788 simply failed—not that it exhibited temperature fluctuations or burned her. (Doc. 62 ¶¶ 5, 95.) The other issues addressed in this Form–483 similarly lack a clear connection to Plaintiffs alleged defective battery weld. (TAG Ex. 11, Doc. 62–12 at 2; Doc. 62–18 at 2; Doc. 62 ¶ 13.)

Plaintiff also submits recall notices, device correction notices, and a 2009 FDA warning letter documenting CGMP manufacturing deviations as proof of other PMA violations. (Doc. 66 at 20.) While these documents paint a troubling picture, most do not demonstrate the violation of a specific Model 3788 PMA requirement or establish a causal link between a violation and Plaintiff's injury. The FDA warning letter indicates that Defendant's design validation testing was not in full compliance with § 820.30(g), but like the Form–483 above, this letter addressed procedures and issues that are not probative of Plaintiffs alleged battery weld failure. (Doc. 62–12 at 4–5.) Similarly, a number of recall notices and device correction updates cited by Plaintiff are directed at device failures that are not directly rele-

vant to Plaintiff's injury, such as an improperly positioned battery and circuit board or complaints of device heating during charging. (See Doc. 62–8 at 2; TAC Ex. 8, Doc. 62–9 at 2.)

However, Plaintiff identifies two Model 3788 recalls due to battery weld issues; these recalls appear to describe Plaintiff's alleged device failure. (TAC Ex. 5, Doc. 62–6; TAC Ex. 9, Doc. 62–10.) Defendant's May 24, 2011 and July 26, 2012 voluntary recall notices describe battery weld cracks that could disable the Model 3788 IPG's ability to communicate or recharge. (*Id.*) In the May 24th notice, Defendant "identified a need to improve process controls," while on July 26, 2012, Defendant "identified a need to more frequently maintain and replace certain tools during the internal battery welding process...." (*Id.*) The battery issues prompting these recalls bear a strong resemblance to Plaintiffs allegations that her Model 3788 failed due to a cracked battery weld.

The TAG alleges that recalls represent per se violations of FDA requirements. (Doc. 62 ¶ 32.) FDA regulations distinguish a recall from a market withdrawal. Significantly, "[r]ecall means a firm's removal or correction of a marketed product that the [FDA] considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure." [8] 21 C.F.R. § 7.3(g). Manufacturers are free to remove or correct a distributed product on their own initiative, but "[a] firm that does so because it believes the product to be violative is requested to notify" the FDA. 21 C.F.R. § 7.46(a). In turn, the FDA may classify a manufacturer's action as a recall if the FDA "regards the product as involving a

violation that is subject to legal action, e.g., seizure." *Id.*

Based on the FDA's definition of a recall, it is plausible that Defendant's violation of federal law resulted in the described battery weld issues in the above recalls. Furthermore, the overlap between these recalls and Plaintiffs alleged injury is highly suggestive that Plaintiffs injury stemmed from the same violations that triggered the FDA's recall classification. Defendant's anticipated corrective actions indicate that the violations identified by the FDA could be addressed by adjusting the manufacturing processes used with the Model 3788.

When pleading parallel claims, the Eleventh Circuit requires a plaintiff to allege specific PMA requirements that have been violated. *Wolicki–Gables,* 634 F.3d at 1301. Plaintiff argues these recall notices are "sufficient evidence of plausible PMA and FDA violations," but the TAG is not explicit as to which PMA violations the recalls evince. (Doc. 66 at 21.) Nevertheless, a liberal reading of the TAG indicates that the battery weld recalls were allegedly based on Defendant's failure to comply with CGMP regulations applied to the manufacture of the Model 3788 under 21 C.F.R. § 820.30(a-g). (Doc. 62 ¶¶ 74(e), 75.) These allegations track Defendant's notice that it would revise the manufacturing processes related to the Model 3788 battery.

"CGMPs are FDA regulations setting standards for manufacturing practices, which are incorporated by reference into the PMA." *Sadler v. Advanced Bionics, Inc.,* 929 F.Supp.2d 670, 685–86 (W.D.Ky. 2013). In the past, the Eleventh Circuit has discouraged the practice of citing only CGMPs to state a parallel claim. *Wolicki–*

---

8. In contrast, "[m]arket withdrawal means a firm's removal or correction of a distributed product which involves a minor violation that

would not be subject to legal action by the Food and Drug Administration or which involves no violation...." 21 C.F.R. § 7.3(j).

*Gables,* 634 F.3d at 1301–1302 (citing *Ilarraza v. Medtronic, Inc.,* 677 F.Supp.2d 582, 588 (E.D.N.Y.2009)). The disadvantage of relying on CGMPs to state a parallel claim is that their "intentionally vague and open-ended" nature conflicts with the need to identify the violation of a device-specific PMA requirement. *See Ilarraza,* 677 F.Supp.2d at 588. But here, the situation is distinguished by the FDA's indication that a violation related to failed battery welds has occurred. By classifying Defendant's withdrawals of Model 3788 devices as recalls, the FDA has implicitly asserted that battery weld cracks resembling Plaintiff's injury were not manufactured in compliance with FDA regulations. Under these circumstances, it is highly suggestive that Defendant's CGMPs violations related to manufacture of the Model 3788 could support a parallel claim.

 Ultimately, Plaintiff alleges that Defendant had a duty under federal law to adhere to CGMP requirements incorporated into PMA Supplement No. S023 that govern the manufacture of the Model 3788, and that the FDA recall classifications show that Defendant breached this duty by violating FDA regulations. Plaintiff further alleges that this breach proximately caused her injury. Plaintiff's state claim for negligence based on this alleged violation of a Model 3788 PMA requirement is "genuinely equivalent" to Defendant's requirements under federal law; since it is premised on violations of federal duties established by the FDA, Plaintiff's negligence claim does not impose state requirements that are different from or in addition to federal law. *See Riegel,* 552 U.S. at 330, 128 S.Ct. 999; *Wolicki–Gables,* 634 F.3d at 1300. Thus, Plaintiff adequately alleges a parallel claim for negligence and further states a plausible claim for relief.

For these reasons, Defendant's Motion to Dismiss is **DENIED** for Plaintiffs negligence claim related to the manufacture of the Model 3788, consistent with the parameters set forth in this section of the Order, and **GRANTED** for her strict liability claim.

### E. Negligent Failure to Warn

Plaintiff alleges a negligent failure to warn claim based on Defendant's failure to timely file Medical Device Reports ("MDR") and adverse event reports, as required by the FDA. (Doc. 62 ¶ 102.) Plaintiff claims that the FDA requires medical device manufacturers to submit timely MDRs upon learning of "any adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and ... is occurring with unexpected frequency," and that Defendant failed to submit timely MDRs prior to her December 24, 2009 Model 3788 implantation. (*Id.* ¶¶ 37, 119.) Plaintiff alleges that she was harmed as a result of Defendant's "failure to warn Plaintiff and the general public by timely filing MDR and adverse event reports" with the FDA. (*Id.* ¶ 105.) She argues that Defendant's violation of this duty to report gives rise to a parallel claim.

 "To establish a failure to warn claim, plaintiff must show that defendant had a duty to warn, that defendant breached that duty, and that the breach was the proximate cause of plaintiffs injuries." *Haynes v. Cyberonics, Inc.,* 1:09–CV–2700–JEC, 2011 WL 3903238 (N.D.Ga. Sept. 6, 2011) (citing *Dietz v. Smithkline Beecham Corp.,* 598 F.3d 812, 815 (11th Cir.2010)). "After PMA approval, manufacturers of Class III devices must comply with [MDR] requirements." *Hughes v. Boston Scientific Corp.,* 631 F.3d 762, 765 (5th Cir.2011) (citing 21 U.S.C. § 360i(a)(1); 21 C.F.R. § 803.50(a)). To

escape preemption, Plaintiff must not only allege that Defendant breached its duty to follow the MDR reporting standards.[9] Plaintiff must also plausibly allege that Defendant's reporting failure was the proximate cause of her injury.

■ The TAC does not support this last element. Plaintiffs claim ultimately must allege that if Defendant had properly filed MDRs in accordance with FDA regulations, this information would have reached Plaintiff or her physician in time to prevent her injury.[10] Plaintiff alleges that, over a six-month prior to her implantation surgery, Defendant did not timely report to the FDA: (1) one failure of a single implanted device involving battery weld issues; and (2) Defendant's series of internal quality reviews and audits taken to address battery weld cracks. (Doc. 62–1 ¶¶ 119–124.)

These allegations are insufficient to plausibly allege causation for a number of reasons. First, the FDA's disclosure of MDRs to the public is not guaranteed.[11] *See* 21 C.F.R. § 803.9 ("[the FDA] *may* disclose to the public any report ... submitted under this part") (emphasis added).

Thus, there is no guarantee that the FDA would have disclosed MDRs that were timely filed by Defendant. Second, Plaintiff does not clearly allege that Defendant outright failed to file an MDR for these events; only that they were not timely filed. Defendant may have subsequently reported each incident to the FDA outside of the 30–day MDR deadline with enough time for the FDA to publicly disclose this information and inform Plaintiff.[12] Third, with respect to Defendant's series of internal quality reviews and audits, Plaintiff has not alleged that the FDA's disclosure of Defendant's timely filed MDRs would necessarily provide Plaintiff with specific, actionable information. In addition to disclosing information at its discretion, the FDA withholds trade secret or confidential information, *see* § 803.9(b)(1), defined generally at 21 C.F.R, § 20.61. The Court can only speculate whether, following Defendant's reporting of its internal processes to the FDA, the FDA would or would not ultimately disclose information from these MDRs that could be plausibly linked to battery weld issues the Model 3788.

***

9. The Eighth Circuit has rejected state law failure to warn claims that are based entirely on a manufacturer's failure to report adverse events to the FDA without alleging an injury caused by this omission. *See In re Medtronic, Inc., Sprint Fidelis Leads Products Liab. Litig.*, 623 F.3d 1200, 1205–06 (8th Cir.2010). The court determined such claims were impliedly preempted under 21 U.S.C. § 337(a). *Id.* ("Finally, Plaintiffs alleged that Medtronic failed to provide the FDA with sufficient information and did not timely file adverse event reports, as required by federal regulations.... [T]hese claims are simply an attempt by private parties to enforce the MDA, claims foreclosed by § 337(a)" (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349, 353, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001))).

10. The Fifth Circuit recently described this theory of causation. *See Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 776 (5th Cir. 2011) ("Hughes's primary causation theory is that if Boston Scientific had reported the true number of injuries and malfunctions related to burns caused by the HTA, this information would have appeared on the FDA's MAUDE internet database and in medical journals, and with this information Dr. Weber would not have recommended the HTA to Hughes for treatment, nor would Hughes have chosen the HTA as a treatment option").

11. Indeed, Plaintiffs allegations do not explain if or how the FDA would disclose Defendant's MDRs detailing internal reviews and revisions to the Model 3788 manufacturing process.

12. Manufacturers are required to submit MDRs within 30 days of learning of an adverse event. 21 C.F.R. § 803.10(c).

Fourth, even if Defendant withheld these MDRs, it is implausible that the failure of a single implanted device due to battery weld issues over a six-month period would prompt action from the FDA, Plaintiff, or Plaintiffs medical providers. As discussed above, the FDA knew when it approved the Model 3788 that IPGs carry a risk of battery failure. When a certain number of device failures are actually anticipated by the FDA, it is implausible that either the FDA's or Plaintiff's medical providers' opinion of the Model 3788 would be affected by the failure of one device. And while Plaintiff alleges that she personally "would not have purchased the subject stimulator had all MDR filings and adverse events been timely reported" (Doc. 62 ¶ 116), any traditional duty of Defendant to directly warn Plaintiff of adulterated goods is preempted by § 360k(a). *See Purcel v. Advanced Bionics Corp.*, 3:07-CV-1777-M, 2010 WL 2679988 (N.D.Tex. June 30, 2010) (citing *Horowitz v. Stryker Corp.*, 613 F.Supp.2d 271, 286-287 (E.D.N.Y.2009)). Defendant's reporting obligation is to submit MDRs to the FDA, and nowhere does Plaintiff allege if or how she personally consulted FDA disclosures while deliberating whether to purchase the Model 3788.

As a result, Plaintiff does not plausibly allege that she was injured as a result of Defendant's failure to timely file MDRs.[13] Because causation is not adequately alleged, Defendant's Motion to Dismiss is **GRANTED** on Plaintiff's negligent failure to warn claim.

### F. Fraud and Material Misrepresentation

Plaintiff's claim of fraud and material misrepresentation [14] alleges that she was harmed by relying on Defendant's false statements about the battery life of the Model 3788. (Doc. 62-1 ¶¶ 115-156.) The TAG further alleges that Plaintiff was harmed by Defendant's "omissions" and "concealment" of known Model 3788 failures (*see id.* ¶¶ 152-156), but Plaintiff argues that her claim is more accurately based on "specific false representations made by Defendant regarding battery life in the sale of the [Model 3788]." (Doc. 66 at 33.)

"In order to prove fraud [in Georgia], the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." *Summit Automotive Group, LLC v. Clark*, 298 Ga. App. 875, 681 S.E.2d 681, 686 (2009) (citation and punctuation omitted). Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires a Complaint "alleging fraud or mistake ... [to] state with particularity the circumstances constituting fraud or mistake." In *American Dental Association v. Cigna Corporation*, 605 F.3d 1283 (11th Cir.2010), the Eleventh Circuit reiterated that, "pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4)

---

**13.** In contrast, *Hughes* provides a more plausible example of this type of claim. *Hughes*, 631 F.3d at 767, 770-771 (holding that a negligent failure to warn claim was not preempted and survived summary judgment where a device manufacturer failed to report

300 incidents of relevant device failure over a five-year period).

**14.** Though titled as a claim for material misrepresentation in her TAG, Plaintiff characterizes claim as a fraud claim as well. (Doc. 66 at 30.)

what the defendants gained by the alleged fraud.'" *Id.* at 1291 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir.1997)) (internal quotation marks omitted).

Plaintiff's fraud claim lacks this required particularity. The most specific allegations cited by Plaintiff in her claim relate to Defendant's marketing of the Model 3788 "as the 'smallest and longest lasting spinal cord stimulator on the market,' which ... was 'guaranteed to last 10 years without replacement.'" (Doc. 62–1 ¶ 148.) These allegations fail to describe the time, place, or person responsible for such representations, and thus lack the required particularity for fraud claims. However, in her breach of express warranty claim, Plaintiff alleges that on December 24, 2009, Mr. Botha, an employee of Defendant's, orally represented to her that the Model 3788 was "guaranteed to last at least 10 years," and that she might need to have the battery surgically replaced after 10 years. (Doc. 62 ¶¶ 89, 93.) Plaintiff had the Model 3788 implanted that day; she alleges that Mr. Botha made this representation "shortly before" her surgical implantation. (*Id.*)

Due to the overlap between this statement and the statements Plaintiff cites in her fraud claim, the Court will construe Plaintiffs fraud claim to incorporate this oral representation. But even with the benefit of Mr. Botha's statement, Plaintiffs fraud claim fails. Plaintiff has not plausibly alleged justifiable reliance on this oral representation. The TAG does not suggest that Plaintiffs implantation surgery was urgent, sudden, or unexpected. Thus, it appears likely that she had adequate time before her December 24, 2009 surgery to consider her purchase of the Model 3788. Under such circumstances, these allegations do not plausibly demonstrate her justifiable reliance based on a representation to Plaintiff on the day of her scheduled surgery to implant the Model 3788, especially not when it was made "shortly before" her actual surgery.

To the extent Plaintiff's fraud claim is based on Defendant's omissions of information regarding known device failures, it is preempted. The FDA regulates the labeling—including warnings and instructions—of Class III devices, and states may not impose a duty on manufacturers to provide "different, additional warnings" relating to safety or effectiveness. *Leonard,* 2011 WL 3652311 at *11. Requiring Defendant to notify Plaintiff of battery failures is an additional requirement that relates to safety or effectiveness and is thus preempted. *See id.*

For these reasons, Defendant's Motion to Dismiss is **GRANTED** on Plaintiff's claim of fraud and material misrepresentation.[15]

### III. Conclusion

Defendant's Motion to Dismiss [Doc. 65] is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's claims for strict liability, negligent failure to warn, fraud, and material misrepresentation are **DISMISSED.**

---

**15.** The Court previously considered a nearly identical fraud claim between the parties in the context of a motion to remand a separate action. In that case, the Court found that such a fraud claim could survive a motion to dismiss with the benefit of Georgia's notice pleading standard. (*See Cline v. ANS,* No. 1:13–CV–2628–AT, Doc. 27 at 5.)